J-S82026-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
GREGORY MACK :
:
Appellant : No. 3266 EDA 2017

Appeal from the Judgment of Sentence January 27, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005280-2014

BEFORE: LAZARUS, J., OLSON, J., and STRASSBURGER*, J.

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 22, 2019**

Appellant, Gregory Mack, appeals from the judgment of sentence entered on January 27, 2017, following his jury trial convictions for attempted murder, aggravated assault, persons not to possess a firearm, carrying a firearm without a license, carrying a firearm on public streets in Philadelphia, and possession of an instrument of crime.[1] We affirm.

We briefly summarize the facts and procedural history of this case as follows. The aforementioned charges stemmed from an incident that occurred on December 22, 2013, wherein Dajohn Comer was shot numerous times and sustained serious injuries. Appellant proceeded to a jury trial in January 2016 that ended in a deadlock and subsequent mistrial. Following a second trial in October 2016, a jury convicted Appellant of all charges. On January 27, 2017,

_____

[1] 18 Pa.C.S.A. §§ 901/2502, 2702(a)(1), 6105(a)(1), 6106(a)(1), 6108, and 907, respectively.

_____

* Retired Senior Judge assigned to the Superior Court.

the trial court imposed an aggregate sentence of 26 to 52 years of incarceration.

On February 5, 2017, Appellant filed a timely post-sentence motion alleging, *inter alia*, that the jury's verdict was against the weight of the evidence. On April 4, 2017, the trial court removed original trial counsel and appointed replacement counsel to represent Appellant on appeal. On June 6, 2017, Appellant's post-sentence motion was denied by operation of law. On July 17, 2017, Appellant's new counsel filed a collateral relief petition seeking *nunc pro tunc* reinstatement of appellate rights. That petition alleged that due to the change in counsel, newly appointed counsel did not receive the order denying Appellant's post-sentence motion by operation of law. The trial court granted *nunc pro tunc* relief by order entered on September 11, 2017. On October 6, 2017, Appellant filed a counseled notice of appeal.[2] On November 3, 2017, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely on November 13, 2017, raising the claim that the verdict was against the weight of the evidence. On April 20, 2018, this Court received correspondence from the Philadelphia Clerk of Courts that it was sending the certified record to this Court without an opinion pursuant to Pa.R.A.P. 1925(a),

---

[2] Although not entirely clear from our review of the record, it appears that the trial court appointed yet another attorney to represent Appellant and that attorney currently represents Appellant on appeal.

- 2 -

because the Honorable Roger Gordon, who presided over Appellant's trial, was no longer sitting as a judge in Philadelphia County.

On appeal, Appellant presents the following issue for our review:

Were the verdicts against the weight of the evidence and shock the conscience?

Appellant's Brief at 2.

Initially, we note that we are presented with a unique procedural situation because the trial court judge is no longer sitting and did not rule on Appellant's weight of the evidence claim prior to leaving the bench. Our Supreme Court has addressed this issue as follows:

The general rule in this Commonwealth is that a weight of the evidence claim is primarily addressed to the discretion of the judge who actually presided at trial. There is, of course, some tension between the power of trial courts to overturn jury verdicts premised upon weight claims, and the bedrock principle that questions of credibility are exclusively for the fact-finder. Accordingly, the authority of the trial judge to upset a verdict premised upon a weight claim is narrowly circumscribed. A trial judge cannot grant a new trial because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion. Instead, a new trial should be granted only in truly extraordinary circumstances, *i.e.*, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

[Our Supreme] Court [has] also consistently recognized that, while an appellate court may review whether the trial court abused its discretion in deciding a weight claim, its role is not to consider the underlying question in the first instance. Appellate review is generally cabined in this regard because of the disparity in vantage points between trial and appellate courts:

An appellate court by its nature stands on a different plane than that of a trial court. Whereas a trial court's

- 3 -

decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon the cold record.

Thus, as [our Supreme Court has explained,] while there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence, there is surely no justification for an appellate court, relying upon a cold record, to exercise such a function. Given the unique nature of the power reposed in the trial court concerning a weight claim, [the Supreme] Court has emphasized on a number of occasions that one of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that new process was or was not dictated by the interests of justice. Accordingly, where the reasons for the trial court's granting or denying a new trial appear in the record, [our Supreme] Court has held that only a palpable abuse of discretion will warrant upsetting that decision on appeal.

None of the decisions holding that an appellate court may not review a ruling on a weight claim by considering the evidence itself in the first instance, however, raised the question [of] whether an appellate court is barred from reviewing such a claim where the judge who presided over the trial never ruled on the claim and is now permanently unavailable to do so. Upon careful consideration of this issue of first impression, [our Supreme Court] agree[d] that this circumstance warrants an exception to the general rule barring appellate review of weight claims in the first instance.

\*        \*        \*

[…W]here a properly preserved weight of the evidence claim is raised on appeal and the judge who presided at trial failed to rule on the claim and is now permanently unavailable to do so, the claim must be reviewed by the appellate tribunal in the first instance. [Our Supreme Court stated that it was] confident in the ability of our appellate courts to apply this exception appropriately, with an eye to the delicate balance that exists between the jury's exclusive role in assessing credibility, and [Pennsylvania's] longstanding recognition of the power in courts to allow justice another opportunity to prevail when a verdict nevertheless shocks the judicial conscience. In this regard, [] our appellate courts are well-familiar with weight claims. Although

- 4 -

appellate review has been confined to an assessment of the trial judge's exercise of discretion, it obviously has been necessary to consider the proper role and contours of the weight of the evidence doctrine, in evaluating that exercise of discretion. This holding exists as an exception to [the] general rule.

***Armbruster v. Horowitz***, 813 A.2d 698, 702–705 (Pa. 2002) (internal citations, quotations, footnotes, and original brackets omitted).

Here, Appellant properly raised and preserved his weight of the evidence claim. The trial judge never ruled on the claim and now he is permanently unavailable. Hence, as an exception to the general rule, we will review Appellant's weight claim for the first time on appeal.

Appellant claims that his convictions were against the weight of the evidence for several reasons. First, Appellant argues, "the evidence showed that the [victim] could not and did not identify [A]ppellant during trial [as the perpetrator of the crimes]." Appellant's Brief at 17. Appellant argues that the victim also "averred that no one asked him directly who [] shot him because he indicated to those to whom he spoke that he did not know who shot him." ***Id.*** Appellant maintains that the victim's statements to police that Appellant shot him were made under the influence of pain pills and unreliable. ***Id.*** at 19. Moreover, at trial, the emergency medical technician (EMT) who transported the victim to the hospital testified that the victim told him that his friend shot him; on appeal, Appellant claims the testimony was invalid and lacked veracity because the EMT did not make a record of the conversation or subsequently inform the police of it. ***Id.*** at 18. Appellant additionally claims that the victim's mother, who was also riding in the ambulance, testified that

her son was unintelligible, further undermining the EMT's testimony. *Id.*
Appellant suggests that there was also "evidence indicating that other persons
may have had a motive to shoot" the victim, but that police failed to
investigate because they had already decided "that [A]ppellant was the party
responsible for the shooting." *Id.* at 19-20. Finally, Appellant argues, "the
Commonwealth failed to present any physical evidence connecting [A]ppellant
to the crime" because "no shell casings or other ballistic evidence was found
at the scene." *Id.* at 19.

As set forth above, a new trial based upon the weight of the evidence
should be granted "only in truly extraordinary circumstances, *i.e.*, when the
jury's verdict is so contrary to the evidence as to shock one's sense of justice."
***Armbruster***, 813 A.2d at 702. A new trial is not warranted, however, based
upon "a mere conflict in testimony." *Id.* Moreover, "[o]ur law is crystal clear
that the trier of fact, in passing upon the credibility of witnesses and the weight
of the evidence produced, is free to believe all, part, or none of the evidence
presented." ***Commonwealth v. Hopkins***, 747 A.2d 910, 914 (Pa. Super.
2000).

At trial, the Commonwealth presented the testimony of the victim.
Although he testified he could not recall what happened on the night of the
shooting or his subsequent statements to police, the Commonwealth
presented the victim with his written statement to police, taken soon after his
release from the hospital. N.T., 10/5/2016, at 26-40. In that statement, the
victim claimed that he was outside of his house with Appellant at 1:30 a.m.

on the night in question. *Id.* at 35. There were no other people present. *Id.* at 37. Appellant went into the house across the street to retrieve a jacket because he was cold. *Id.* at 35. When Appellant returned, he stood on the left side of the victim. *Id.* The victim heard a loud bang in his left ear and fell to the ground. *Id.* The victim identified Appellant by a photograph to which he attested by signature. *Id.* at 37-41. The victim also told police that he had been inside the residence where Appellant retrieved his jacket, on three prior occasions, and that Appellant showed him a .25 caliber semi-automatic firearm. *Id.* at 36-37. The victim testified that he did not want to appear in court, because he now has a son and no longer wants "to bring the situation up." *Id.* at 46. The Commonwealth also presented the victim's grand jury testimony, which largely mirrored his statement to police. *Id.* at 53-64. Moreover, the victim additionally testified before the grand jury that when he awoke in the hospital, he told his mother that Appellant shot him. *Id.* at 65.

The EMT testified that although the victim's mother rode to the hospital in the ambulance, she was seated in the front of the vehicle next to the driver. N.T., 10/5/2016, at 106 and 108. The EMT testified that he asks patients multiple questions to keep them alert and to obtain as much information as possible to assist in their medical intervention. *Id.* at 109-110. When asked who shot him, the victim stated it was a friend. *Id.* at 113. On cross-examination, the EMT clarified that the victim "[c]ould have said his homie, but he referred to somebody who he knew personally." *Id.* at 129.

The EMT also explained that he did not document the statement on his subsequent medical report because "only medical information [is] supposed to be documented." *Id.* at 115. The emergency surgeon testified that the victim "had two gunshot wounds to his face and four to his torso." N.T., 10/7/2016, at 52. The surgeon did not know if there were bullets removed from the victim's abdomen, but several bullet fragments were recovered from the victim's head. *Id.* at 55-56.

The victim's mother testified that, from inside her house, she heard gunshots and rushed outside to find her injured son screaming and lying on the ground bleeding. N.T., 10/6/2016, at 12-13. Paramedics arrived quickly and the victim's mother rode to the hospital in the front passenger seat of the ambulance. *Id.* at 14. She could hear most, but not all, of the conversation between her son and the EMT in the back of the ambulance. *Id.* at 15. The victim's mother stated that she did not hear her son tell the EMT that his friend shot him, but she was "paying attention with how fast [they] were going to get [to the hospital] because that was one of [her] main concerns." *Id.* at 42-43. After four days in a medically induced coma, the victim awoke and told his mother, "G-Mack did it." *Id.* at 16. The victim told his mother that they were talking outside, "G-Mack said he was cold and he was going to grab a jacket" and when he returned, he shot the victim. *Id.* at 17. The victim's mother testified that her son told her that Appellant owned "a little raggedy .25" caliber firearm that he saw inside Appellant's home. *Id.* at 21.

An investigating officer who conducted the interview of the victim stated that although the victim was under the effects of pain medication, he was coherent and not impaired so as to affect his ability to give an interview. *Id.* at 153-154. The investigating officer read the victim's statement for the record at trial. *Id.* at 159-164. In that statement, the victim claimed that he and Appellant were the only people on the street at the time of the incident and that Appellant was standing on his left side when he heard a loud bang in his left ear. *Id.* at 160. The victim stated that Appellant had shown him a .25 caliber semi-automatic pistol on three separate occasions inside Appellant's house. *Id.* at 162. The victim identified Appellant to police by photograph and adopted the identification by signature. *Id.* at 164.

In executing an arrest warrant for Appellant, police investigated and saw Appellant frequenting a residence on Darien Street. N.T., 10/7/2016, at 25-27. The owner of that property was driving a vehicle when police stopped her. *Id.* at 26. Appellant and two other females were inside that vehicle at the time of the stop. *Id.* at 25-27. Police recovered a firearm from one of those women. *Id.* at 26. Police then directed the driver to drive two blocks to her residence. *Id.* at 27. At the driver's house, police interviewed Appellant who gave them two false names and then fled. *Id.* at 27-28; 61-68. Police apprehended and arrested Appellant two blocks away hiding in a backyard. *Id.* at 28; 68. The driver of the vehicle gave consent to search her home after police told her they were investigating Appellant. *Id.* at 29-30. Police limited their search to areas in the home where Appellant spent time, according to

the homeowner, which included the living room and the basement. *Id.* at 31-32. Under a couch cushion in the living room, police recovered a .357 caliber Magnum firearm, a clip and a magazine for a .25 caliber handgun, and a box containing twenty-seven, .25 caliber bullets.[3] *Id.* at 33-34. Police however, did not recover any fired bullet casing cartridges at the scene of the crime. N.T., 10/6/2017, at 90.

Based upon our review of the record, we conclude that Appellant's weight of the evidence is without merit. The Commonwealth presented evidence that Appellant was the sole person present when the victim was shot. The victim told his mother, police officers, and a grand jury that Appellant was the perpetrator. Further, the EMT who rendered emergency aid immediately after the shooting testified that the victim told him that his friend shot him. While no ballistics evidence was recovered from the scene, the Commonwealth presented evidence that Appellant possessed a .25 caliber firearm that he kept inside the residence he exited immediately prior to the shooting and police witnessed Appellant frequenting another residence wherein they recovered .25-caliber ammunition and a magazine from an area where Appellant spent time. The jury also heard evidence that once detained, Appellant gave false

---

[3] Appellant was found not guilty in a separate prosecution for possession of the firearm recovered from the residence on Darien Street. N.T., 10/7/2016, at 41.

- 10 -

names to police and then fled.[4]  Appellant's current claim largely centers on inconsistencies in the witnesses' trial testimony.  However, conflicts in testimony are not cause for a new trial.  The jury was free to believe all, part, or none of the evidence presented and we may not usurp their findings.  Finally, we conclude the jury's verdict was simply not so contrary to the evidence as to shock one's sense of justice.  Accordingly, Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/19

---

[4] "Evidence of flight or self-concealment on the part of a person who knows that he or she is wanted for a crime may be admitted to show consciousness of guilt...."  **Commonwealth v. Toro**, 638 A.2d 991, 999 (Pa. Super. 1994) (citation omitted).